PEOPLE *v.* DOWELL.

1. ASSAULT WITH INTENT TO RAVISH — AGE OF CONSENT — INSTRUCTIONS.

In a prosecution for an assault upon a female child under the age of 16 years, with intent unlawfully and carnally to know, the intent is the gist of the offense, and the jury should be specifically instructed to distinguish as to whether improper liberties taken with the person of the prosecutrix were or were not accompanied by the intent charged.

2. SAME.

So, too, actual violence, or actual assault, is essential to the commission of the crime, and an instruction that the prosecutrix could not give her consent, and, "if respondent sought to do that with her with that intent, then he would be guilty," was erroneous, as leading the jury to infer that it would be sufficient if respondent merely solicited the intercourse.

3. SAME—EVIDENCE—HEARSAY.

Where, on such prosecution, there was evidence that respondent, after the alleged assault, gave the prosecutrix a bicycle, and told her to tell her parents that a girl had let her take it, testimony of the mother of the prosecutrix as to what the latter told her about the bicycle was hearsay, and inadmissible.

4. SAME—CROSS-EXAMINATION OF RESPONDENT.

It was error to permit the prosecution, on the cross-examination of respondent, to ask him a series of questions relating to his conduct with another girl some years before, and whether he had not been sued for such conduct.

Exceptions before judgment from Lenawee; Chester, J. Submitted February 26, 1904. (Docket No. 202.) Decided April 5, 1904.

Francis Dowell was convicted of an assault with intent to commit the crime of statutory rape. Reversed.

The respondent was informed against and convicted of an assault upon one Minnie Pieh, a female child under the

age of 16 years, with intent to feloniously, unlawfully, and carnally know her. She lacked but one month of being 16 years of age. The respondent was a farmer, 54 years of age, and lived, with his family, a neighbor to the prosecutrix's family. The assault is alleged to have been committed on June 1, 1901, in broad daylight, in front of defendant's shed, along the public highway.

The only testimony tending to show any undue familiarity on the part of respondent is that of the prosecutrix, who says that at one time, before the alleged assault, respondent and his wife were at her father's house. Respondent asked for a drink of water. The prosecutrix went to the pantry to get it for him. He followed her, put his arm around her neck, and kissed her, and said that she should come down there the next day or the next night, and stay all night; that his wife was going to the Farmers' Club; and that she should tell them that she stayed at her sister's.

The prosecutrix's version of the assault is as follows:

" Now, the next time I had any conversation or experience with Mr. Dowell was when I went after the duck eggs, on the 1st of June. I came along there, and he was fixing a tongue on a wagon, and he stopped me, and he says— He asked me first where I was going, and then I told him, and then he says, 'Go through the woods;' he says, 'I will go with you;' he says, 'I am going back there to dig up some stumps.' So I told him, 'No,' I would go around the road; and then he took hold of my arm, and tried to pull me into the shed, and I wouldn't go. I told him I was afraid I would get in a family way; and he says, 'I will get you a French safe.' No one else was around there. He said his wife had gone to Deerfield."

On cross-examination she testified:

" I resisted him. I made all the resistance necessary to protect myself. He took hold of my arm, and tried to pull me into the shed, but he did not disarrange my clothing, or knock off my hat, or displace a button. Not a single thing was done there to my wearing apparel by which it was put out of shape or out of order. There was no scuffle."

The witness testified that, subsequently to this transaction, the respondent wrote and gave a letter to her, which she destroyed. She testified that she thought that in that letter respondent said "I should meet him in the woods;" that she afterwards saw him standing behind a bush in the woods; that she then went into the garden, where her brother was working; that respondent came up to the fence, talked with them, and, when her brother was not looking, motioned her to follow him; that once afterwards he was standing or sitting behind a bush, and called from there to her to come over, but she paid no attention to him; that she went into the house, shut the door, and that respondent came, rapped at the door, and then went away; that he afterwards gave her a bicycle, telling her to tell her parents that another girl had let her take it. On the 21st of June he wrote her a letter, asking her to keep still as to what had happened, both for his sake and her own.

The respondent denied the transaction. His wife also testified that she was present at the time, and that nothing improper took place.

*John Riley* and *Watts, Smith & Baldwin*, for appellant.

*Theodore M. Joslin*, Prosecuting Attorney (*J. N. Sampson*, of counsel), for the people.

GRANT, J. (*after stating the facts*). 1. This is an anomalous case. I have found no one like it in the books. The only act of familiarity previous to the alleged assault, testified to by the prosecutrix, was that at her own house, when he, in the presence of her mother and his own wife, followed her into the pantry, put his arm around her neck, kissed her, and invited her to his house. She does not testify to any other act of impropriety, or to any request for sexual intercourse, or to any fondling of her person. So far as the record shows, she only inferred from his conduct what he desired. She shows a not very creditable knowledge of the meaning of sexual intercourse and its

consequences. At the time of the alleged assault she does not testify that he made any proposition to her for sexual intercourse. If, as she testified, his wife and son were away, naturally he would have invited her into the house, instead of seeking to take her into an open shed along a public highway to accomplish a heinous crime. If she understood his object to be sexual intercourse when he took hold of her arm, and she said she was afraid of the consequences, and he then promised to get her a French safe, the language of his reply would hardly justify the conclusion that he contemplated intercourse at that time, but at some future time.

Under the statute (section 11489, 3 Comp. Laws), under an information charging rape a respondent can be convicted of the lesser offense of assault with intent to commit the crime of rape. *People* v. *Courier,* 79 Mich. 366 (44 N. W. 571); *Hanes* v. *State,* 155 Ind. 112 (57 N. E. 704); *Liebscher* v. *State* (Neb.) 95 N. W. 870. The intent is the gist of the offense, and every laying on of hands upon a female under the age of consent, even though improper, does not necessarily imply an intent to have sexual intercourse. Indecent liberties may be taken with a child without any such intent. The statute recognizes this in providing a penalty for taking indecent and improper liberties with a female child without intending to commit the crime of rape. Section 11719, 3 Comp. Laws. This court held that where the respondent put his arm around the waist of a child, with no offer or threat or request to be allowed to take any other liberties with her person, he was not guilty under the statute. *People* v. *Sheffield,* 105 Mich. 117 (63 N. W. 65). The language used in that case is equally applicable here:

"Such mere familiarity, participated in and consented to by the child, in the absence of indecent and improper liberties, between a man over 50 years of age and a girl under 14, who have been intimate and frequently in each other's company, does not constitute an assault."

There is evidence from which it may be inferred that

the respondent intended to have sexual intercourse with the prosecutrix. In cases of this kind it is the duty of the court to carefully instruct the jury as to the distinction between improper liberties with the intent to have sexual intercourse and improper liberties without such intent. The court, in his instruction, said to the jury:

"As I said to you, she could not give consent, even though she might have been the one who solicited it. If he sought to do that with her with that intent, then he would be guilty."

This certainly, standing alone, would be erroneous, because it would leave out the question of assault. Actual violence or actual assault is essential to the commission of this crime, even upon a girl under the age of consent. This language, standing by itself, would leave the jury to infer that it would be sufficient if he solicited the intercourse. It is due to the learned circuit judge to say that that was probably not what he intended, because immediately following he says that, if he did not assault her with that intent, then he would not be guilty. The jury, however, might be misled into considering that, if he approached her with that in view, this would constitute an assault. For this reason we think the charge was erroneous.

2. It was claimed that the respondent gave the prosecutrix a wheel on June 16th, and that he told her to tell her folks that one Lillie Aten let her take the wheel. The prosecutrix's mother was permitted to testify to what her daughter told her afterwards in regard to this wheel. This was erroneous. It was hearsay testimony, and not admissible under the rule permitting evidence of complaints made to others after the commission of the offense.

3. On cross-examination of respondent, under objection and exception, the following questions were asked·

" Q. Do you know Gussie Poole?
"A. Yes, sir.
" Q. Isn't it true that about three years ago you assaulted her in this same way?

"*A.* No, sir.

" *Q.* Put your arms around her?

"*A.* No, sir.

" *Q.* And took indecent liberties with her?

"*A.* No, sir.

" *Q.* And isn't it true that you told her you would buy her a dress if she would keep still?

"*A.* No, sir.

" *Q.* Well, you were sued for that, were you not?

"*A.* Yes, sir.     *     *     *

" *Q.* You were sued for doing that thing, were you not?

"*A.* Why, I couldn't say exactly; no.

" *Q.* Do you say, Francis Dowell, that you don't know whether you were sued for putting your arm around Gussie Poole and taking indecent liberties with her?

"*A.* I think that was it; yes, sir.     *     *     *

" *Q.* You know Gussie Poole's mother?

"*A.* Yes, sir.

" *Q.* And isn't it true that you offered to buy her a dress if she would let you do as you pleased with her?

"*A.* No, sir."

This method of cross-examination was condemned in *People* v. *Gotshall*, 123 Mich. 474 (82 N. W. 274). It appeared that, though the suit referred to had long been pending, it had never been brought to trial.

Conviction reversed, and new trial ordered.

The other Justices concurred.