(No. 5712.   October 8, 1931.)

STATE, Respondent, v. J. B. BERNHARDT, Appellant.

[3 Pac. (2d) 537.]

Peterson & Clark, for Appellant.

Fred J. Babcock, Attorney General, and Z. Reed Millar, Assistant Attorney General, for Respondent.

BUDGE, J.—Appellant was convicted of the crime of assault with intent to commit rape and was sentenced to serve a term at hard labor of from one to fourteen years in the state penitentiary. He has appealed from the judg-

ment of conviction and from an order denying motion for new trial.

The material facts are substantially as follows: Appellant, a man 64 years of age, owned a house in Pocatello which he rented to the mother of prosecutrix, Manda Brewster, who on August 18, 1929, with her five children, were occupying the same. On this date, about 10 A. M., Manda Brewster left the home and remained away until late in the afternoon. About 3 o'clock in the afternoon of said day appellant went to the home of Manda Brewster and found the prosecutrix, 11 years old, and her brother, 13 years old, in one of the sleeping rooms playing a phonograph. The other children were outside of the house. Appellant, as he testified he was frequently in the habit of doing, laid down on the bed. At his request, the oldest boy went to the Keystone Farm, about eight or ten blocks away, to get a jug of water from a well and was gone between twenty and thirty minutes. Prosecutrix testified as follows:

"Q. While your brother was gone after the water what did Mr. Bernhardt do? A. He talked to me and got on top of me and put me on top of him and then he got on top of me and tried to put his hands up my bloomers.

"Q. Then what did he do? A. I picked up a sofa pillow and he took it away from me and then I got a coat hanger.

"Q. What was the condition of the front of his trousers when he got on top of you? A. Unbuttoned."

When appellant tried to get his hands up her bloomer legs prosecutrix told him to stop and he stopped. Prosecutrix testified further with reference to a coat-hanger and sofa pillow, which were shown by the evidence to have been used by the prosecutrix for the purpose of teasing or annoying appellant and the use of which was continued after the alleged assault, as follows:

"Q. Did he have the coat hanger first? A. No, sir.

"Q. Did you touch him with it? A. No sir. . . . .

"Q. What did you do with the pillow? A. I was looking at it.

"Q. Did Doc Bernhardt grab the pillow from you? A. No sir.

"Q. Did you grab it from him? A. No sir, he laid it on the other side of the bed. . . . .

"Q. What did you do with the pillow? A. I laid it down and got the coat hanger.

"Q. There didn't seem to be any more quarrel between you but you got the coat hanger? A. Yes sir.

"Q. Where was that? A. Laying on the bed.

"Q. Did Doc grab that from you? A. Yes sir.

"Q. What happened then? A. He took it and laid it over there and then I got it. . . . .

"Q. You were quite mad as you got up, when this took place? A. No sir.

"Q. Were you mad at Dock Bernhardt? A. No sir. . . . .

"Q. After you grabbed the coat hanger, you say that he gave it to you? A. He took and grabbed it.

"Q. Then what happened? Then I took it and went out.

"Q. You were not mad at him? A. Yes sir. . . . .

"Q. When the difficulty arose over the clothes hanger what did you say to him? A. I didn't say anything.

"Q. What did he say to you? A. He didn't say anything. . . . .

"Q. What did you—did I ask you—after you think Doc did this to you, I believe you said there was a little playfulness over the pillow and the coat hanger following that,—how long did that last? A. I don't remember.

"Q. Was it a few minutes? A. It wasn't five minutes.

"Q. Were you still mad at Doc? A. When?

"Q. When you were playing with this coat hanger and the pillow? A. Yes sir.

"Q. You didn't grab him in any way? A. No sir. . . . .

"Q. Were you playing with the pillow and the coat hanger or were you trying to get them? A. I was playing with them.

"Q. Was that before Doc put you on top of him or afterward? A. Afterward. . . . .

"Q. That was on Sunday the 18th of August that I am asking about, did he hit you or abuse you or do something to you? A. No sir. . . . . .

"Q. Did he touch your body? A. He tried to get his hands up my bloomer legs.

"Q. Did he? A. No sir. . . . . .

"Q. Did you tell him to stop? A. Yes sir. ·

"Q. Did he stop? A. Yes sir. . . . . ''

It appears that after the foregoing events took place the prosecutrix went to the home of Mrs. Henderson, a neighbor, who, as disclosed by the record, was, to say the least, extremely unfriendly to appellant. The prosecutrix made complaint to Mrs. Henderson, which evidence was admitted without objection, that the appellant had been after her again trying to ·get his hands up her bloomer legs. Mrs. Henderson testified that the prosecutrix was very excited and crying and could hardly talk when she arrived at the witness' home. The police were immediately notified by Mrs. Henderson, who, upon their arrival, informed them what the prosecutrix had told her. When the prosecutrix's mother returned home the prosecutrix made a complaint to her, and that evening the mother of prosecutrix went to the police station and prosecutrix made a complaint to a police officer. Appellant was a frequent visitor at the Brewster home. He ate his meals there whenever he did not have time to go uptown. He owned part of the furniture and ran in and out of the house at all times. It was the habit of appellant to romp and play with prosecutrix as well as other children in the immediate neighborhood. Prosecutrix frequently teased appellant by taking his hat, his keys and other articles which resulted in appellant scuffling with prosecutrix. Great familiarity existed between appellant and the children of Mrs. Brewster. The evidence further discloses that Manda Brewster had made statements to her sister and one other party from which it may be gathered that she had in mind putting appellant in a compromising position with the purpose in view of extorting money from him, which she denied.

■ There is but one error assigned that requires consideration, namely, the insufficiency of the evidence to sustain the verdict and the judgment based thereon. Appellant denied emphatically that he at any time or place assaulted or intended or attempted to assault prosecutrix with intent to carnally know her. Admitting her story to be true, the evidence conclusively shows that the child's person was not touched, her clothing was not disarranged or torn and her outward appearance was not in any way disturbed. She testified she was not at first angry with appellant but later when he took the pillow and coat-hanger from her she then appears to have become angry. The rule is that an assault with intent to commit rape upon a female under the age of consent is committed by the perpetrator wilfully or feloniously laying hands upon her person with the design to carnally know her. (*State v. Garney*, 45 Ida. 768, 772, 265 Pac. 668.) Appellant had every opportunity, without any apparent interference, to have committed the crime of rape or of an assault with intent to commit rape upon prosecutrix had he intended so to do. Intent to commit the crime charged is the essence of the offense. As said in *People v. Dowell*, 136 Mich. 306, 99 N. W. 23, 24:

"The intent is the gist of the offense, and every laying on of hands upon a female under the age of consent, even though improper, does not necessarily imply an intent to have sexual intercourse."

Intent cannot be presumed but must be shown to exist by competent evidence and beyond a reasonable doubt. Where the evidence shows lack of intent no conviction can be upheld.

We are convinced that there is a total absence of proof of intent on the part of appellant to commit the crime charged and that the evidence otherwise is insufficient to establish such crime.

From what has been said it follows that the judgment must be reversed and a new trial had, and it is so ordered.

Lee, C. J., and Givens, Varian and McNaughton, JJ., concur.